IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

JAIME BRAVO *et al.*,

      Plaintiffs,

v.                                  No.    08-CV-0010 WJ/KBM

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF DOÑA ANA *et al*,

      Defendants.

## FINDINGS OF FACT AND RECOMMENDATION
## ON DISPOSITION OF MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER is before me on Plaintiffs' Motion for Preliminary Injunction (*Doc. 125*), by reference from Judge Johnson to conduct "any legal analysis required to recommend to the Court an ultimate disposition of said motion." (*Doc. 169*).  Having reviewed the parties arguments as well as the applicable law, I recommend that Plaintiffs' Motion be denied for the reasons stated herein.

### BACKGROUND

On January 3, 2008, Defendant Ken Miyagishima removed this action to federal court.  *Doc. 1.*  On April 7, 2008, Plaintiffs filed their First Amended Complaint (*Doc. 25*), and on June 16, 2008, Plaintiffs filed their Second Amended Complaint (*Doc. 36*), which details the following causes of action in this lawsuit: (1) violation of their civil

rights protected by the New Mexico Constitution, Article II, §§ 13 and 18, and the

Eighth and Fourteenth Amendments of the United States Constitution giving rise to a

cause of action pursuant to the provisions of 42 U.S.C. §§ 1983 and 1988; (2) negligent

acts and omission giving rise to tort claim pursuant to the New Mexico Tort Claims Act,

NMSA 1978, §§ 41-4-6 and 41-4-9; and (3) discriminatory acts and omission in violation

of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et. seq.*, and Section 504 of the

Rehabilitation Act, 29 U.S.C. § 794.  *Doc. 36* at 4.  In their Complaint, Plaintiffs seek

various forms of relief including injunctive relief, compensatory and punitive damages,

as well as attorneys fees.  *Id.* at 58-59.

Plaintiffs are a group of individuals that were or are housed at Doña Ana County

Detention Center ("DACDC") for various periods of detainment and are seeking class

certification.  *See Doc. 116.*[1]  Defendants are the Board of County Commissioners for the

County of Doña Ana, the Doña Ana County Detention Center, Christopher Barela,

Todd Garrison, the Doña Ana County Sheriff's Office, as well as all John or Jane Doe

Defendants involved in the operation of the Doña Ana County Detention Center and

the Doña Ana County Sheriff's Office.[2]

_____

[1] This motion is opposed by Defendants and as of the filing of this Report and
Recommendations, Plaintiffs motion for class certification has not yet been ruled on.

[2]  Plaintiff also named an additional group of entities and individuals as
Defendants: the City of Las Cruces, Ken Miyagishima, Terrence Moore, Harry Romero,
the Las Cruces Police Department, and all John and Jane Doe Defendants involved in

On May 2, 2009, Plaintiffs filed their Opposed Motion for Preliminary Injunction. *Doc. 125.* Defendants filed their Response on June 22, 2009 (*Doc. 145*), and Plaintiffs filed their Reply on July 17, 2009 (*Doc. 156*). On September 22, 2009, I issued an Order for additional briefing on the motion (*Doc. 181*), and Plaintiffs filed their brief on October 6, 2009 (*Doc. 184*), and Defendants filed their brief on October 20, 2009 (*Doc. 190*).

In their Motion for Preliminary Injunction, Plaintiffs request the Court to issue a preliminary injunction requiring the following:

1)  Defendants shall create a mental health treatment system within its medical services unit in the detention center under the full-time direction of a board certified psychiatrist;

2)  Enjoinment of Defendants, their subordinates, agents, employees and all others acting in concert with them, from subjecting Plaintiffs and other people with medical and mental disabilities to the alleged illegal actions set forth in Plaintiffs Complaint;

3)  Defendants shall implement an effective, initial and periodic medical, mental and emotional health screening program for all detainees at DACDC, so as to ensure that detainees who have or who develop mental and/or emotional disorders receive appropriate medical and mental health treatment;

4)  Defendants shall staff the facility in such a manner that DACDC provides

---

the operation of the Las Cruces Police Department. Plaintiffs are not seeking a preliminary injunction against this group of Defendants because Plaintiffs have settled their claims against those Defendants. *See Doc. 125* at 1, footnote 1. Hereinafter, all references to "Defendants" will refer only to the entities and individuals against whom the preliminary injunction is sought.

individualized treatment to each inmate with a mental illness including but not
limited to supportive treatment, suicide prevention, reduced frequency and
duration of psychiatric crises and appropriately supervised medication and
medical intervention as necessary;

5)  Enjoinment of Defendants, their subordinates, agents, employees and all
others acting in concert with them, from segregating inmates because they have a
mental illness or placing in maximum segregation any detainee who has
previously manifested a history of mental or emotional disability; and

6)  Defendants shall implement an effective discharge planning program for
inmates who are undergoing treatment for medical conditions or mental health.

*Doc. 125.*  In its Reply, Plaintiffs expand on their request and ask for an injunction

which would:

1)  Require the DACDC Defendants to develop and implement a system of
medical and mental health treatment within its medical services unit in
the detention center, consistent with professionally recognized standards
of care. (This applies to entire class.);

2)  Require that the DACDC Defendants have an intake procedure which
screens all persons booked into the DACDC to determine at minimum
whether an individual has a major mental illness and assess each person
for suicide risk. (This applies to entire class.);

3)  Require that the DACDC intake and screening procedures contain
objective as well as subjective information so that people with serious
mental illness or those who may be at risk of suicide are seen timely by a
qualified mental health professional. (This should be applied to the
subclass of people with serious mental illness or those who may be at risk
of suicide.);

4)  Require that the facility have a sufficient number and variety of mental
health staff, allowing time for:
          a.        Psychiatrists to conduct psychiatric assessments consistent
with professional standards of care, of those identified with or suspected

of having major mental illness whether upon intake or during their incarceration (This should be applied to the subclass of inmates identified with or suspected of having major mental illness.);

      b.      Psychiatrists and qualified mental health professionals to provide crisis intervention and stabilization (This should be applied to the subclass of inmates in need of crisis intervention and stabilization.);

      c.      Psychiatrists to provide follow up to assure psychiatric medication management, consistent with professional standards of care (This should be applied to the subclass of inmates taking psychiatric medication.);

      d.      Psychiatrists and other qualified mental health professionals to develop and implement individualized treatment plans (This applies to entire class.); and

      e.      Psychiatrists and other qualified mental health professionals to provide follow up mental health treatment as frequently as clinically indicated and to assure continuity of care while incarcerated. (This applies to entire class.).

5)  Require that the DACDC Defendants develop and implement procedures for use of seclusion and restraint so that inmates with mental illness are secluded and restrained only to the extent necessary to prevent imminent harm to self or others and only until timely psychiatric attention is provided. (This should be applied to the subclass of inmates with mental illness at risk of or actually subject to seclusion or restraint.);

6)  Require that DACDC Defendants provide for inpatient mental health care to those class members with acute psychiatric symptoms. (This should be applied to the subclass of inmates with acute psychiatric symptoms.);

7)  Prohibit the DACDC Defendants from segregating inmates with mental illness because they have a mental illness. (This should be applied to the subclass of inmates with mental disabilities as defined by the ADA and Section 504.);

8)  Require the DACDC Defendants to screen inmates with mental illness being considered for segregation and require DACDC to monitor the mental health of any such inmate placed in segregation. (This should be

applied to the subclass of inmates with mental illness at risk of or actually placed in segregation.);

9)  Require the DACDC Defendants to provide discharge planning, including sufficient medication, and arranging for the necessary follow up mental health and support services, before the inmate is released back into the community so that there is continuity of care. (This should be applied to the entire class.);

10)  Require the Doña Ana County Sheriff's Office ("DACSO") Defendants to develop and implement a specialized response system for responding to calls involving persons with mental illness. All policies and procedures that are part of this specialized response system shall be consistent with nationally-recognized principles standards for police-based diversion programs such as those set forth in the Criminal Justice/Mental Health Consensus Project Report. (This applies to existing subclass of arrestees);

11)  Require the DASCO Defendants to develop and implement policies and procedures which provide that:
        a.  The DASCO will not target people who appear to have mental disabilities for questioning, intervention, or arrest; and
        b.  DASCO law enforcement officers have the training and authority to divert persons who appear to have a mental disability to available community mental health resources when responding to incidents involving such persons, as an alternative to arrest. (This applies to existing subclass of arrestees.).

12)  Require the DASCO Defendants to provide its officers with Crisis Intervention Team training or its functional equivalent for responding appropriately to individuals who appear to have a mental disability. (This applies to existing subclass of arrestees.).

*Doc. 156* at 15-17.

For the reasons discussed below, I conclude that Plaintiffs have not met their

burden of proving a necessity for issuance of a preliminary injunction by this Court and

I recommend denying their Motion.

STANDARD OF REVIEW

A preliminary injunction is an extraordinary remedy that should only be granted

when the moving party clearly and unequivocally demonstrates its necessity.  *See*

*Schrier v. Univ. of Colorado*, 427 F.3d 1253, 1258 (10th Cir. 2005); *see also United States ex*

*rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc.*, 883 F.2d

886, 888-89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with

caution, a preliminary injunction should be granted only in cases where the necessity

for it is clearly established.").  To obtain a preliminary injunction, a moving party must

establish the following four factors: (1) a likelihood of success on the merits; (2)

irreparable harm to the movant if the preliminary injunction is denied; (3) the

threatened injury to the movant outweighs the injury to the other party under the

preliminary injunction; and (4) the injunction is not adverse to the public interest.  *RoDa*

*Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) (citing *Winter v. Natural Res.*

*Def. Council, Inc.*, 129 S. Ct. 365, 374 (2008)); *see also O Centro Espirita Beneficiente Uniao*

*Do Vegetal v. Ashcroft*, 342 F.3d 1170, 1177 (10th Cir. 2003).

In some circumstances, the Tenth Circuit has modified the analysis and held that

if the moving party "can establish that the latter three requirements tip strongly in his

favor, the test is modified, and the plaintiff may meet the requirement for showing

success on the merits by showing that questions going to the merits are so serious,

substantial, difficult and doubtful as to make the issue ripe for litigation and deserving

of more deliberate investigation." *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250,

1255-56 (10th Cir. 2003) (quoting *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002)).

However, since the limited purpose of a preliminary injunction "is merely to

preserve the relative positions of the parties until a trial on the merits can be held," the

Tenth Circuit has identified three types of specifically disfavored preliminary

injunctions: (1) preliminary injunctions that alter the status quo; (2) mandatory

preliminary injunctions; and (3) preliminary injunctions that afford the movant all the

relief that it could recover at the conclusion of a full trial on the merits.  *Schrier*, 427 F.3d

at 1259 (*quoting Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)).  These disfavored

injunctions are "more closely scrutinized to assure that the exigencies of the case

support the granting of a remedy that is extraordinary even in the normal course." *Id.*

at 1259 (quoting *O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973,

975 (10th Cir. 2004) (*en banc*), *aff'd on other grounds*, 546 U.S. 418 (2006)).  Parties who

seek a disfavored injunction "are not entitled to rely on the modified

likelihood-of-success-on-the merits standard." *Id.* at 1261.  "Instead, a party seeking

such an injunction must make a strong showing both with regard to the likelihood of

success on the merits and with regard to the balance of harms . . . ." *Id.*

-8-

Here, Plaintiffs concede that their Motion falls into at least the first two categories of disfavored injunctions. *Doc. 184* at 3. However, relying exclusively on an opinion from the District of Kansas, *Bey v. Douglas County Correctional Facility*, 540 F.Supp.2d 1194, 1196 (D. Kan. 2008), Plaintiffs argue that the more stringent test used to analyze disfavored injunctions should not be applied to their case because Plaintiffs seek relief for alleged constitutional violations. *Doc. 184* at 4. In *Bey*, the judge recognized that disfavored injunctions are subjected to a heightened burden. 540 F. Supp.2d at 1196. However, without citing any authority, the judge found that the injunction sought by plaintiff did "not fall into one of the categories because he seeks relief for violation of his First, Eighth, and Fourteenth Amendment rights." *Id.* The judge provided no other analysis or rationale for why an injunction, which otherwise would fall into a disfavored category, would be exempt from the heightened standard because it was premised upon constitutional violations.

Importantly, the judge's approach in *Bey* was implicitly rejected six months later by the Tenth Circuit in another case where a prisoner was seeking an injunction to remedy an alleged violation of his Eighth Amendment rights. *Edmisten v. Werholtz*, 287 Fed. App'x 728, 729-30 (10th Cir. 2008).[3] Despite the alleged constitutional violation, the

---

[3] The Court appreciates the candor exhibited by Plaintiffs who, while arguing for the *Bey* approach, cited the contrary authority of *Edmisten*.

Court still analyzed the requested preliminary injunction under the heightened

standard set out in *Schrier.* *Id.* at 731.  Given the lack of support or compelling rationale

for the *Bey* position as well as the contrary analysis in *Edmisten*, I will apply the scrutiny

described in *Schrier.*[4]

A<small>NALYSIS</small>

As described above, to obtain a preliminary injunction, a moving party must

establish each of the following four factors: (1) a likelihood of success on the merits; (2)

irreparable harm to the movant if the preliminary injunction is denied; (3) the

threatened injury to the movant outweighs the injury to the other party under the

preliminary injunction; and (4) the injunction is not adverse to the public interest.

*Siegal*, 552 F.3d at 1208.  Because Plaintiffs seek a disfavored preliminary injunction,

they must "make a strong showing both with regard to the likelihood of success on the

merits and with regard to the balance of harms . . . ."  *Schrier,* 427 F.3d at 1261.

A.  Likelihood of Success of the Merits:

Assessing likelihood of success in this case is particularly daunting given the

dramatic factual disputes between the parties.  The factual disputes center around the

---

[4] Moreover, *Bey* involved a far less drastic injunction than the injunction sought by Plaintiffs in the instant case.  Specifically, the *Bey* plaintiff was seeking an injunction which would require prison officials to provide him with Kosher food in accordance with his Jewish faith.  540 F.Supp.2d at 1195-96.  Compared to the injunction sought here, the *Bey* injunction was trivial.

-10-

key issue in the case: is the treatment of inmates with mental disorders constitutionally

inadequate?  The determination of adequacy of treatment will rest heavily on the

battling experts.  Prior to a trial and the attendant cross-examination of the experts, it

does not seem possible to make the credibility assessments necessary to determine

"likelihood of success."  By this sheer uncertainty, one could conclude that Plaintiffs

have failed to establish a likelihood of success, let alone a "strong showing" of such.

However, because, as described below, I find that Plaintiffs fail to establish the

remaining factors, I need not decide if this factor is met.

B.  Irreparable Harm:

To obtain injunctive relief, a Plaintiff must show that he or she will suffer

irreparable injury if his request for injunctive relief is denied.  *Schrier*, 427 F.3d at 1258.

Irreparable harm is injury that is "certain, great, actual 'and not theoretical.'"  *Heideman*

*v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (quoting *Wisc. Gas Co. v.*

*FERC*, 758 F .2d 669, 674 (D.C.Cir. 1985)).  Irreparable harm is not harm that is "merely

serious or substantial."  *Id.*  "[T]he party seeking injunctive relief must show that the

injury complained of is of such *imminence* that there is a clear and present need for

equitable relief to prevent irreparable harm."  *Heideman*, 348 F.3d at 1189 (quoting

*Prairie Band of Potawatomi Indians v. Pierce*, 253 F.3d 1234, 1250 (10th Cir. 2001) (emphasis

in original)).

-11-

The Tenth Circuit has noted, in the context of a First Amendment case, that "when an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001).  The Court, however, has never explicitly held that it adopts this presumption.  It is unclear whether a presumption of irreparable injury applies to all constitutional claims, claims under certain constitutional provisions, or only particular fact situations.  *See Edmisten*, 287 Fed. App'x at 733 (not reaching the issue of whether the presumption of irreparable injury applied to Eighth Amendment claims because the movant could make a strong showing of irreparable injury under any of the Tenth Circuit's formulations); *cf. Schrier*, 427 F.3d at 1266 (determining that plaintiff was not entitled to a presumption of irreparable injury because he failed to demonstrate the requisite likelihood of success on his free speech and academic freedom claims).

For the purposes of this case, I will assume that the presumption of irreparable injury applies to claims of Eighth Amendment violations.  Even so, Plaintiffs do not have a strong case that they will suffer irreparable injury if the injunction is not granted.

The weakness in their position arises from the fact that none[5] of the named plaintiffs[6] are currently incarcerated at DACDC.  An injunction is only appropriate "to prevent existing or presently threatened injuries.  One will not be granted against something merely feared as liable to occur at some indefinite time in the future."  *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931).  Plaintiffs attempt to claim "presently threatened injuries" versus "something merely feared as liable to occur" by arguing that there is a "strong likelihood that the named Plaintiffs may return to the facility at some point in the future, as six of the named Plaintiffs have been incarcerated at DACDC more than once."  *Doc. 126* at 22.  However, the Court does not agree that the likelihood of the future incarceration of the named Plaintiffs at DACDC is sufficient to qualify as "presently threatened."  *See Honig v. Doe*, 484 U.S. 305, 320 (1988) (Court "generally [has] been unwilling to assume that the party seeking relief will repeat the type of misconduct that would once again place him or her at risk of that injury.").  Therefore, I find that Plaintiffs have not met their burden of showing irreparable harm if the

---

[5] In their Brief, Plaintiffs state that "most of the named Plaintiffs are no longer incarcerated at DACDC, as set forth above."  *Doc 126* at 22.  However, having reviewed the facts asserted about each named plaintiff, it appears that none of them are currently incarcerated at DACDC.  *Doc.* 126 at 4-17.

[6] The Court has not certified the class at this time, so the "class members" listed in Plaintiffs' brief are not relevant plaintiffs in this analysis.

preliminary injunction is not granted.[7]

C.      Balance of the Harms:

As stated earlier, in order to prevail on a motion for preliminary injunction,

plaintiffs must make a strong showing with regard to balance of the harms. *Schrier*, 427

F.3d at 1261.  Here, Plaintiffs assert that "Plaintiffs' need for care is so great, the

deprivation of their constitutional rights so substantial, that the level or irreparable

harm they suffer far outweighs Defendants' financial burden." *Doc. 156* at 14.

The Court recognizes the seriousness of the Plaintiffs' allegations of

constitutional violations.  However, as noted above, the facts regarding the mental

health treatment provided by DACDC are hotly disputed and the named Plaintiffs are

not currently in DACDC's custody.  When addressing the balance of harms factor,

Plaintiffs understate the impact when they describe the only potential harm to the

Defendants as mere "financial losses."  The requested preliminary injunction is both

demanding and broad.  *Doc.* 132 at 15-17; *Doc. 126* at 33-34.  It would require the hiring

of or contracting with significant numbers of well-paid professionals, extensive work to

develop new procedures for a host of issues (*e.g.* intake, screening, seclusion, restraint,

---

[7] Of course, this analysis of irreparable harm would change if the Court certifies the proposed class.  However, it would not lead to a different recommendation because, as discussed below, the Plaintiffs also fail to meet the remaining prerequisites for issuing of the preliminary injunction.

specialized response team, etc.), extensive training to implement the new procedures, contracting for or constructing new space required by the new procedures and likely other actions.

Of course, the requested injunction may be required to remedy the constitutional violations alleged by Plaintiffs.  However, imposing such a drastic injunction on Defendants before the Court has been able to review all the evidence through a trial would be unwise.  If even some of the provisions of the preliminary injunction are later deemed unnecessary because the Plaintiffs do not prevail on a particular claim, the Defendants will have been dramatically impacted by the improvident preliminary injunction.  The harm to Defendants would go beyond the mere expenditure of funds. *Cf.*, *Kan. Hosp. Ass'n v. Whiteman*, 835 F. Supp. 1548, 1553 (D. Kan. 1993) (budgetary harm to a state in delaying Medicaid changes has been found "not very significant in comparison to the irreparable harm that would be caused . . . individual Medicaid beneficiaries.").  For example, additional psychiatrists would have already been hired or contracted to satisfy the preliminary injunction, and the Defendants could not easily walk away from those contracts even if the Court later ruled in their favor at trial.

Recalling that, because this preliminary injunction is of the type disfavored under the law, Plaintiffs must make a strong showing with regard to balance of the harms.  Plaintiffs have not done so.

D.    The Public Interest:

Plaintiffs contend that the public interest favors issuance of an injunction because the public would benefit from "having detainees with mental illness receive treatment for their mental and medical conditions." *Doc. 126* at 23.  Additionally, Plaintiffs state that "the public interest is inherently served by the protection of important civil and constitutional rights."  *Id.* at 24.  These statements are truisms with which the Court agrees.  However, Plaintiffs fail to recognize the important public policy interests in not imposing the proposed injunction given the current procedural posture of the case.

Two important policy interests weigh against the proposed injunction: federalism and separation of powers.  These interests are well explained by the Ninth Circuit Court of Appeals in *Hoptowit v. Ray*, 682 F.2d 1237, 1246 (9th Cir. 1982):

> In entertaining a cause of action alleging Eighth Amendment violations in a state prison, federal courts must be cognizant of the limitations of federalism and the narrowness of the Eighth Amendment.  Federal courts lack the power to interfere with decisions made by state prison officials, absent constitutional violations.  Courts must recognize that the authority to make policy choices concerning prisons is not a proper judicial function. *Bell v. Wolfish*, 441 U.S. 520, 562 (1979).  Any needed prison reform is an executive and legislative responsibility.  The function of a court is limited to determining whether a constitutional violation has occurred, *Rhodes v. Chapman*, 452 U.S. 337, 348-49 (1981), and to fashioning a remedy that does no more and no less than correct that particular constitutional violation.  *See Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 16 (1971).  The Eighth Amendment is not a basis for broad prison reform.

*Id.* (citations shortened).

Certainly, the principles of federalism and separation of powers do not support turning a blind eye to constitutional violations in state prisons. However, they do counsel against imposing such a sweeping injunction before a trial has determined that constitutional violations are occurring. *Rizzo v. Goode*, 423 U.S. 362, 378 (1976) ("Where, as here, the exercise of authority by state officials is attacked, federal courts must be constantly mindful of the "special delicacy of the adjustment to be preserved between federal equitable power and State administration of its own law."). A review of the proposed injunction quickly reveals that it would require invasive supervision of DACDC by the federal court if granted. One provision would "[r]equire the DACDC Defendants to develop and implement a system of medical and mental health treatment within its medical services unit in the detention center, consistent with professionally recognized standards of care." *Doc 156* at 15. It is difficult to know how the Court would enforce this provision without the benefit of a trial laying out exactly what those standards of care are in the context of a prison. Another provision would

> [r]equire that the facility have a sufficient number and variety of mental health staff, allowing time for:
> a. Psychiatrists to conduct psychiatric assessments consistent with professional standards of care, of those identified with or suspected of having major mental illness whether upon intake or during their incarceration (This should be applied to the subclass of inmates identified with or suspected of having major mental illness.);
> b. Psychiatrists and qualified mental health professionals to

provide crisis intervention and stabilization (This should be applied to the subclass of inmates in need of crisis intervention and stabilization.);

c. Psychiatrists to provide follow up to assure psychiatric medication management, consistent with professional standards of care (This should be applied to the subclass of inmates taking psychiatric medication.);

d. Psychiatrists and other qualified mental health professionals to develop and implement individualized treatment plans (This applies to entire class.); and

e. Psychiatrists and other qualified mental health professionals to provide follow up mental health treatment as frequently as clinically indicated and to assure continuity of care while incarcerated. (This applies to entire class.).

*Id.* at 15-16.  Again, prior to a full trial, the Court is ill-suited to determine the "sufficient number and variety of mental health staff" to perform this catalog of tasks.

One particularly invasive provision would "[r]equire the Doña Ana County Sheriff's Office ("DACSO") Defendants to develop and implement a specialized response system for responding to calls involving persons with mental illness. All policies and procedures that are part of this specialized response system shall be consistent with nationally-recognized principles standards for police-based diversion programs such as those set forth in the Criminal Justice/Mental Health Consensus Project Report." *Id.* at 17.  This provision would go beyond supervision of the jail to supervision of how law enforcement officers deal with criminal or emergency calls out in the street.  While such supervision through injunction may prove necessary after a trial on the merits, public policy interests advise against doing so when the Court has

-18-

such limited information.

A review of the remaining provisions of the proposed injunction serve to strengthen the Court's concern that issuing this preliminary injunction with limited information in a circumstance where the key facts are in keenly disputed would require constant and invasive supervision and intervention by the federal court into the activities of the prison and the police force.  While such a dramatic involvement may prove necessary to protect the constitutional rights of Plaintiffs, public policy weighs against doing so without the clarity of facts that a trial will bring.

CONCLUSION

After careful consideration, the Court finds that Plaintiffs have failed to satisfy their burden of justifying this extraordinary remedial request prior to trial. Accordingly, I recommend that Plaintiffs' Motion for Preliminary Injunction be denied.

Wherefore,

IT IS HEREBY RECOMMENDED THAT:

Plaintiffs Motion for Preliminary Injunction (*Doc. 125*) be denied.

_____
UNITED STATES MAGISTRATE JUDGE

THE PARTIES ARE FURTHER NOTIFIED THAT WITHIN 10 DAYS OF SERVICE of a copy of these Proposed Findings and Recommended Disposition they may file written objections with the Clerk of the District Court pursuant to 28 U.S.C. § 636(b)(1).  A party must file any objections with the Clerk of the District Court within the ten-day period if that party wants to have appellate review of the proposed findings and recommended disposition.  If no objections are filed, no appellate review will be allowed.